Blannie S. WILSON, Administratrix of the Estate of Henry J. Wilson, Deceased, Appellant,

v.

JOHNS–MANVILLE SALES CORPORATION, et al.

No. 81–2019.

United States Court of Appeals, District of Columbia Circuit.

Argued April 20, 1982.

Decided July 30, 1982.

Peter C. DePaolis, Washington, D. C., with whom Joseph H. Koonz, Jr., and Roger C. Johnson, Washington, D. C., were on the brief, for appellant.

Leslie H. Wiesenfelder, Washington, D. C., with whom John P. Schnitker for GAF Corp., Washington, D. C., John F. Mahoney, Jr., for Owens-Corning Fiberglas Corporation, Washington, D. C., Robert E. Scott, Jr., for Johns-Manville Sales Corporation, James R. Bucher for Eagle-Picher Industries, Inc., Washington, D. C., Robert P. Watkins for Raybestos Manhattan, Inc., Washington, D. C., James W. Greene for Pittsburgh Corning Corp., Washington, D. C., Francis X. Quinn for Keene Corp., Washington, D. C., Kevin R. McCarthy for Forty-Eight Insulations, Inc., Washington, D. C., Francis J. Ford for Armstrong Cork Co., Washington, D. C., John Jude O'Donnell for Unarco Industries, Inc., Washington, D. C., and Paul F. Sheridan for Fibreboard Corp., Washington, D. C., were on the joint brief for appellees.

James C. Gregg, Washington, D. C., for Pittsburgh Corning Corp.

Randell Hunt Norton, Washington, D. C., for Unarco Industries, Inc.

Before GINSBURG and BORK *, Circuit Judges, and EDMUND L. PALMIERI **, Senior United States District Judge for the Southern District of New York.

Opinion for the Court filed by Circuit Judge GINSBURG.

GINSBURG, Circuit Judge:

 This case presents a novel and difficult legal issue in the context of the mounting volume of litigation relating to deaths or injuries caused by exposure to asbestos products.[1] We are asked to decide whether manifestation of any asbestos-related disease (in this case, asbestosis) triggers the running of the statute of limitations on all separate, distinct, and later-manifested diseases (here, malignant mesothelioma, an extremely lethal form of cancer) engendered by the same asbestos exposure.[2] We hold that time to commence litigation does not begin to run on a separate and distinct disease until that disease becomes manifest.

## I. INTRODUCTION

### A. The Facts

Beginning in 1941, Henry J. Wilson was steadily employed as an insulation worker at various construction sites in the metropolitan Washington, D. C. area. As an inte-

---

* Judge Bork replaces Judge Tamm in the disposition of this case.

** Sitting by designation pursuant to 28 U.S.C. § 294(e).

1. It has been estimated that new asbestos cases are being filed at a rate of 450 a month and that 16,000 such cases are currently pending. Wall St. J., June 14, 1982, at 1, col. 6. Responding, inter alia, to the estimate that 1.6 million workers will die from an asbestos-related disease, see 127 Cong.Rec. S10033 (daily ed. Sept. 18, 1981) (statement of Sen. Hart), members of both Houses of Congress have introduced bills which would provide a comprehensive, nation-wide compensation scheme covering workers who die or are disabled or injured as a result of asbestos exposure. H.R. 5735, 97th Cong., 2d Sess. (1982); S. 1643, 97th Cong., 1st Sess.

(1981). Both bills currently await committee action. Courts, however, may not rely on legislative solutions proposed but uncertain of enactment to avoid their obligation to apply existing law to the cases before them in a just and equitable manner.

2. This is one of several hard issues presented by asbestos-related litigation. Compare Eagle-Picher Indus., Inc. v. Liberty Mut. Ins. Co., 682 F.2d 12, Nos. 81–1761 et al. (1st Cir. June 30, 1982), with Keene Corp. v. Insurance Co. of N. Am., 667 F.2d 1034 (D.C.Cir.1981), cert. denied, — U.S. ——, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982) (insurers' liability); see also DeCosse v. Armstrong Cork Co., 319 N.W.2d 45 (Minn. 1982) (tolling of statute of limitations in Wrongful Death action).

gral element of this employment, Wilson regularly handled and was otherwise exposed to asbestos and asbestos products.

On February 14, 1973, Wilson was x-rayed as part of his local union's routine program instituted to determine which workers, if any, had contracted asbestosis.[3] Evaluation of these x-rays revealed that Wilson was indeed suffering from "mild asbestosis."[4] Following his receipt of this diagnosis,[5] Wilson began a new job, still in the insulation trade, but involving little, if any, exposure to asbestos.[6]

Subsequent to 1973, Wilson's health rapidly deteriorated. He suffered two heart attacks in June 1974 and a collapsed lung in February 1975, and was hospitalized on each occasion. Because of these episodes and on the advice of his physician, Wilson retired.

Complaining of sharp pains in his chest, Wilson was again hospitalized in February 1978. On this occasion, Wilson was diagnosed as having mesothelioma, a cancer of the mesothelial cells[7] with a poor prognosis for recovery. Wilson died on May 17, 1978.[8]

## B. The District Court Proceedings

On May 16, 1979, just short of one year after Wilson's death, his widow, Blannie S. Wilson ("Appellant"),[9] instituted the instant diversity action. Named as defendants (collectively "Johns-Manville")[10] were designers, manufacturers, and distributors of as-

---

**3.** Asbestosis is a "fibrous induration of the lungs due to the irritation caused by the inhalation of [asbestos] dust." See Stedman's Medical Dictionary 116, 990 (3d unabr. law. ed. 1972). Once begun, the condition continues to progress, although it is not a cancerous process. See Comment, Asbestos Litigation: The Dust Has Yet to Settle, 7 Fordham Urb.L.J. 55, 58 (1978). There is usually a long latent period between initial exposure and apparent effect. See I. Selikoff & D. Lee, Asbestos and Disease 143–56 (1978); Selikoff, Bader, Bader, Churg & Hammond, Asbestosis and Neoplasia, 42 Am.J. Med. 487 (1967); infra note 21. For a brief account of asbestosis, see Borel v. Fibreboard Paper Prods. Corp., 493 F.2d 1076, 1083–85 (5th Cir. 1973), cert. denied, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974).

**4.** Defendants' Statement of Material Facts as to Which There is No Genuine Issue at 8, Joint Appendix (J.A.) 89.

**5.** On April 9, 1973, Wilson filed a claim for workers' compensation benefits based on the asbestosis diagnosis.

**6.** See Defendants' Statement of Material Facts as to Which There is No Genuine Issue at 8, J.A. 89; Brief for Appellant at 4.

**7.** Mesothelial cells are flattened cells forming an epithelium that lines the membranes enveloping, inter alia, the lungs and the heart. See Stedman's Medical Dictionary, supra note 3, at 768, 942, 983. Like asbestosis, this disease can manifest itself many years after inhalation ceases. See Keene Corp., 667 F.2d at 1038 n.3. See also I. Selikoff & D. Lee, supra note 3, at 241–44; infra note 21.

**8.** The opinion portion of the autopsy report states:

The immediate cause of death of this 56 year old White male, HENRY J. WILSON, is bronchopneumonia. An acute myocardial infarct was found at autopsy; however, there was no evidence to indicate that this latter lesion was the immediate cause of death. The primary disease process suffered by this patient was a malignant mesothelioma originating in the right pleural space. The etiologic relationship between excessive asbestos exposure and the development of malignant mesothelioma is well established and accepted in the medical literature. In this particular patient, asbestos body (ferruginous body) counts from the left and right lungs were 1184 and 1120 asbestos bodies per five grams of tissue respectively. In a control study of individuals with no known history of sustained asbestos exposure, the asbestos count was less than 100 asbestos bodies per five grams of lung tissue. Therefore, it is my opinion that Mr. Wilson had a sustained heavy exposure to asbestos products and developed pulmonary asbestosis and malignant mesothelioma as a result of this exposure. J.A. 102.

**9.** Blannie S. Wilson is administrator of Henry J. Wilson's estate.

**10.** In addition to Johns-Manville Sales Corp., Appellant's complaint also named as defendants Owens-Corning Fiberglas Corp., Armstrong Cork Co., GAF Corp., The Celotex Corp., Keene Corp., Eagle-Picher Industries, Inc., Fibreboard Corp., Pittsburgh Corning Corp., Raybestos-Manhattan, Inc., Unarco Industries, Inc., Forty-Eight Insulations, Inc., Southern Textile Corp., and Nicolet, Inc. On October 31, 1979, the district court granted Nicolet, Inc.'s motion to dismiss for lack of personal jurisdiction.

bestos and asbestos products, which, allegedly, Wilson frequently used, installed, removed, or otherwise encountered. Proceeding under the District of Columbia's [11] Survival [12] and Wrongful Death [13] statutes, Appellant asserted that Johns-Manville's actions were the direct and proximate cause of her husband's pulmonary illnesses and death. Various theories of product liability, including negligence, breach of express and implied warranty, and strict liability in tort, formed the basis of Appellant's claim for compensatory and punitive damages.

After extensive discovery by the parties, Johns-Manville moved for summary judgment on both statutory counts. Johns-Manville asserted that Henry Wilson had one, and only one, indivisible cause of action for all past, present, and future injuries resulting from his exposure to asbestos products. This cause of action, Johns-Manville claimed, accrued, at the latest, when Wilson first knew or should have known that he was suffering from any asbestos-related disease, *i.e.,* in February 1973, when Wilson was diagnosed as suffering from asbestosis. Therefore, Johns-Manville concluded, the applicable three-year statute of limitations [14] barred the 1979 Survival action. Furthermore, Johns-Manville argued, Appellant's Wrongful Death action was also time-barred; as a wholly derivative claim, Johns-Manville maintained, a Wrongful Death action may not proceed unless the decedent at the time of his death could have initiated a timely action for personal injuries had he lived.[15]

---

**11.** *Erie R. R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), supplies the guiding doctrine when federal jurisdiction is invoked in the District of Columbia on the basis of diversity of citizenship. *Lee v. Flintkote Co.,* 593 F.2d 1275, 1278–79 n.14 (D.C.Cir.1979). *Erie* doctrine mandates that on nonfederal questions a federal district court apply as governing law the law of the forum in which it sits, including the forum's choice of law rules. *See Guaranty Trust Co. v. York,* 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079 (1945); *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941); *cf. Nolan v. Transocean Air Lines,* 276 F.2d 280, 281 (2d Cir. 1960), *vacated and remanded on other grounds,* 365 U.S. 293, 81 S.Ct. 555, 5 L.Ed.2d 571 (1961). In this context, statutes of limitations are considered substantive, *Guaranty Trust Co.;* the diversity court is to apply that statute which the forum's courts would apply to the claim in suit.

Here, the parties, *see* Brief for Appellant at 6–7, 26–27; Brief for Johns-Manville at 1–2, 16, and the district court have assumed that the District of Columbia courts would apply District of Columbia law, including its statute of limitations, to Appellant's claim. Our review proceeds on the basis of that assumption. *See Tuxedo Contractors, Inc. v. Swindell-Dressler Co.,* 613 F.2d 1159, 1161–62 (D.C.Cir.1979); *Lee v. Flintkote Co.,* 593 F.2d at 1279–80; *see also Young v. State Farm Mut. Auto. Ins. Co.,* 213 A.2d 890 (D.C.App.1965).

**12.** D.C.Code § 12–101 (1981).

**13.** D.C.Code § 16–2701 (1981).

**14.** D.C.Code § 12–301(8) (1981); *see infra* p. 115.

In its Reply to Plaintiff's Opposition to Defendants' Joint Motion for Summary Judgment, Johns-Manville also argued that due to "multiple admissions made by and chargeable" to her, *id.* at 12, Appellant should be estopped from denying that asbestosis was the cause of her husband's death. Johns-Manville asserted that these admissions clearly establish that the claim in suit accrued no later than 1973, when the asbestosis diagnosis was made. Apparently, *see infra* note 16, the district court did not rule on this issue.

We reject Johns-Manville's estoppel argument. Our decision establishes that, in the circumstances this case presents, damages occasioned by asbestosis and mesothelioma provide the foundation for separate and distinct claims for relief. On remand, Appellant may pursue relief for the harm caused by mesothelioma. However, recovery for the harm caused by asbestosis is time-barred. Appellant has agreed to so limit the action. *See* Reply Brief for Appellant at 3.

We note that admissions made by a party are not necessarily irretrievable. In the absence of an adversary's justified reliance in preparation for trial, a party may withdraw even formal admissions made pursuant to Fed.R.Civ.P. 36. *See* Fed.R.Civ.P. 36(b). "[This] emphasizes the importance of having the action resolved on the merits . . . ." *Id.,* advisory committee's note of 1970 to subdivision (b). *Cf.* Fed.R.Civ.P. 15(b).

**15.** The complaint was filed, however, within the discrete time limitation governing initiation of actions for Wrongful Death. *See* D.C.Code § 16–2702 (1981) (Wrongful Death actions "shall be brought . . . within one year after the death of the person injured").

Without a written opinion or memorandum explanation,[16] but apparently with some insecurity,[17] the district court granted Johns-Manville's motion and dismissed Appellant's complaint with prejudice.[18] This appeal followed.

## II. ANALYSIS

The applicable statute of limitations, D.C. Code § 12–301(8),[19] provides that a Survival claim "may not be brought after [3 years] from the time the right to maintain the action accrues." Appellant's Survival claim, therefore, is timely only if Henry Wilson had a right of action which "accrued" after May 17, 1976.[20]

**16.** It is regrettable that the district court disposed of this case by unadorned order. *See* J.A. 21. Absent a written explanation, a reviewing court is at a loss to fathom in full the reasoning and authorities relied upon by the district court. Here, the transcript of oral argument on the summary judgment motion provides some clues. Although the district judge "[found] the answer a very difficult one to arrive at," J.A. 25, he apparently believed that Wilson's exposure to asbestos gave rise to only one indivisible cause of action which accrued when asbestosis was diagnosed. *Id.* at 54–55. The district court was more certain as to the entirely derivative nature of the Wrongful Death action: "I don't think there is any question if one is out, that both are out." *Id.* at 37.

**17.** The district judge concluded the hearing with this statement: "I am sure [Mrs. Wilson] will appeal ... and, if [she] succeed[s] in reversing me, I certainly won't be unhappy." *Id.* at 55.

**18.** Less than two months later another judge of the district court ruled the opposite way in a case indistinguishable from this one with respect to the statute of limitations issue. *Fearson v. Johns-Manville Sales Corp.*, 525 F.Supp. 671 (D.D.C.1981) (Survival action commenced May 7, 1980, not time-barred as to lung cancer where decedent was informed he had "mild asbestosis" in early 1973, was diagnosed as having lung cancer in March 1979, and died May 23, 1979). *Contra, Pierce v. Johns-Manville Sales Corp.*, Law No. 124/209/10330 (Balt. Co., Md., Cir. Ct. Sept. 23, 1981), *cert. granted,* No. 7 (Md. Mar. 22, 1982).

**19.** *See Strother v. District of Columbia*, 372 A.2d 1291, 1296 n.8 (D.C.1977).

**20.** The Survival Act "is designed to place the deceased's estate in the position it would have been in had the deceased's life not been cut short." *Semler v. Psychiatric Inst. of Wash.,*

## A. The Discovery Rule

The accrual date of a claim for relief based on a disease with a long incubation period, such as asbestosis or mesothelioma,[21] is an issue on which judicial opinion is in flux. Some courts adhere to the traditional view that " 'the cause of action accrues at the time of invasion of [plaintiff's] body.' " *Steinhardt v. Johns-Manville Corp.*, 54 N.Y.2d 1008, 1010, 430 N.E.2d 1297, 1299, 446 N.Y.S.2d 244, 246 (1981) (quoting *Thornton v. Roosevelt Hospital*, 47 N.Y.2d 780, 781, 391 N.E.2d 1002, 1003, 417 N.Y. S.2d 920, 921 (1979)).[22] Other courts[23] employ the "discovery" rule under which a

*D. C.*, 575 F.2d 922, 925 (D.C.Cir.1978). The time of accrual of the claim the decedent might have brought had he lived is therefore crucial to determination of the timeliness of a Survival claim. *Jones v. Rogers Memorial Hosp.*, 442 F.2d 773, 774 n.1 (D.C.Cir.1971); *Fearson v. Johns-Manville Sales Corp.*, 525 F.Supp. 671, 673 n.2 (D.D.C.1981).

**21.** Asbestosis, which is not a cancerous process, has a latent period of 10 to 25 years between initial exposure and apparent effect. *See Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1083 (5th Cir. 1973), *cert. denied,* 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); I. Selikoff & D. Lee, *supra* note 3, at 205. Even longer periods of time may pass before mesothelioma manifests itself. *See Keene Corp. v. Insurance Co. of N. Am.*, 667 F.2d 1034, 1040 n.9 (D.C.Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 1644, 71 L.Ed.2d 875 (1982); I. Selikoff & D. Lee, *supra* note 3, at 263. Other chemically induced diseases have similarly long incubation periods. *See* 5B *Lawyers Medical Cyclopedia* § 38.46h (1971).

**22.** *See also, e.g., Tyson v. Johns-Manville Sales Corp.*, 399 So.2d 263, 268 (Ala.1981) (asbestos-related diseases). In May 1980, the Alabama legislature overrode the court-made traditional rule and adopted the discovery rule, *see infra* text accompanying notes 23–24, for all asbestos-related injuries. Act No. 80–566, 1980 Alabama Acts (amending Ala.Code § 6–2–30 (1975)). However, the Alabama Supreme Court held that the Alabama Constitution prohibited retroactive application of this statute to claims which had become time-barred prior to the statute's effective date. *Tyson,* 399 So.2d at 270.

**23.** *See, e.g., Urie v. Thompson,* 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949) (silicosis) (Federal Employers' Liability Act); *Karjala v. Johns-Manville Prods. Corp.*, 523

"cause of action accrues when the plaintiff knows or through the exercise of due diligence should have known of the injury." See *Burns v. Bell*, 409 A.2d 614, 617 (D.C. App.1979).[24] Johns-Manville points out that to date "the District of Columbia Court of Appeals has not extended the 'discovery' rule to cases beyond the area of professional malpractice."[25] We are persuaded, however, that, if faced with the issue, the District of Columbia courts would apply the discovery rule to latent disease cases.

In *Burns*, the District of Columbia Court of Appeals held that the discovery rule applies to *all* medical malpractice claims. 409 A.2d at 617.[26] Nothing in the court's opinion implies that the rule should be limited to claims for relief alleging professional malpractice.[27] To the contrary, the court indicated that malpractice cases are merely examples of tort claims in which the fact of injury may not be readily discernible.[28]

With respect to an injury that was not immediately apparent, the *Burns* court characterized the "time of the act" rule as "unduly harsh," *id.* at 616, and the discovery rule as "just and equitable." *Id.* at 617.[29]

We note too that the District of Columbia Court of Appeals, in analogous cases, has followed the trend of decisions away from traditional judge-made rules that operate harshly or are not suited to changed conditions.[30] In latent disease cases the trend is clearly toward application of the discovery rule.[31] Further, federal district judges, called upon to apply District of Columbia law in diversity suits, have employed the discovery rule in latent injury cases. *Fearson v. Johns-Manville Sales Corp.*, 525 F.Supp. 671, 674 (D.D.C.1981); *Grigsby v. Sterling Drug, Inc.*, 428 F.Supp. 242, 243 (D.D.C.1975), *aff'd mem.*, 543 F.2d 417 (D.C. Cir.1976).

---

F.2d 155, 160–61 (8th Cir. 1975) (asbestosis) (applying Minnesota law); *Borel v. Fibreboard Paper Prods. Corp.*, 493 F.2d 1076, 1102 (5th Cir. 1973) (asbestosis) (applying Texas law), *cert. denied*, 419 U.S. 869, 95 S.Ct. 127, 42 L.Ed.2d 107 (1974); *Louisville Trust Co. v. Johns-Manville Prods. Corp.*, 580 S.W.2d 497, 501 (Ky.1979) (mesothelioma); *Harig v. Johns-Manville Prods. Corp.*, 284 Md. 70, 71, 394 A.2d 299, 300 (1978) (mesothelioma).

**24.** *See also* Restatement (Second) of Torts § 899, comment e (1979); W. Prosser, *The Law of Torts* 144 (4th ed. 1971).

**25.** Brief for Johns-Manville at 17 (footnote omitted).

**26.** *Burns* extended the discovery rule beyond those malpractice cases involving "foreign objects." 409 A.2d at 616.

**27.** The court had previously applied the discovery rule to claims of legal malpractice. *Weisberg v. Williams, Connolly & Califano*, 390 A.2d 992 (D.C.App.1978).

**28.** The court stated:
In the more commonplace negligence actions, where the fact of injury is readily discernible, the cause of action accrues when the injury occurs. However, closer scrutiny is necessary in instances, *as in allegations of medical malpractice*, where the injury is not apparent.
409 A.2d at 615 (emphasis added). *Accord, Stoleson v. United States*, 629 F.2d 1265, 1269 (7th Cir. 1980) ("*Urie [v. Thompson*, 337 U.S.

163, 69 S.Ct. 1018, 93 L.Ed. 1282 (1949)] teaches that it is the nature of the problems faced by a plaintiff in discovering his injury and its cause, and not the occupation of the defendant, that governs the applicability of the discovery rule.").

**29.** Before reaching its conclusion, the court weighed the "legitimate conflicting interests" of the parties: "the magnitude of the injury to the plaintiff and his interest in relief against the potential prejudice to the defendant and the latter's interest in being free from stale claims." *Id.* at 616, 617.

**30.** *See, e.g., id.* at 616–17; *Cottom v. McGuire Funeral Serv., Inc.*, 262 A.2d 807 (D.C.App. 1970) (recognizing claim for relief based on strict liability in tort).

**31.** *See Harig v. Johns-Manville Prods. Corp.*, 284 Md. at 80–81, 394 A.2d at 305; Birnbaum, *"First Breath's" Last Gasp: The Discovery Rule in Products Liability Cases*, 13 Forum 279, 282 (1977); McGovern, *The Status of Statutes of Limitations and Statutes of Repose in Products Liability Actions: Present and Future*, 16 Forum 416, 422–23 (1981); Note, *Preserving Causes of Action in Latent Disease Cases: The* Locke v. Johns-Manville Corp. *Date-of-the-Injury Accrual Rule*, 68 Va.L.Rev. 615, 629 & n.97 (1982).
Indeed, Johns-Manville concedes that most courts now apply the discovery rule to latent disease actions. Brief for Johns-Manville at 39 & n.27.

Finally, we believe the discovery rule is ,sensibly based.[32] Courts have long recognized that "[the] policy of repose, designed to protect defendants, is frequently outweighed ... where the interests of justice require vindication of the plaintiff's rights." *Burnett v. New York Central Railroad*, 380 U.S. 424, 428, 85 S.Ct. 1050, 1054, 13 L.Ed.2d 941 (1965). Latent disease claims fit comfortably within this generalization. As Justice Rutledge observed, application of the invasion-of-the-body rule to such cases, which involve "unknown and inherently unknowable" harm, would provide the injured party with only a "delusive" remedy. *Urie v. Thompson*, 337 U.S. 163, 169, 69 S.Ct. 1018, 1024, 93 L.Ed. 1282 (1949). *See also Ricciuti v. Voltarc Tubes, Inc.*, 277 F.2d 809, 813 (2d Cir. 1960) (time-of-the-act rule "would nullify any right to recover for many serious but slowly and insidiously developing diseases"); *Harig*, 284 Md. at 80, 394 A.2d at 305.

Johns-Manville principally argues, however, that even if the discovery rule is applicable to the instant case, Appellant's claim is nonetheless barred by the three-year limitations period. Henry Wilson, Johns-Manville urges most strenuously, had only one indivisible cause of action for asbestos-related injuries and that cause of action accrued five years before he "discovered" that he had cancer; it accrued in 1973 when Wilson "discovered" he was suffering from "mild asbestosis." We now turn to that central contention.

## B. *Distinct Illnesses as Separate Causes of Action*

 Johns-Manville focuses on the alleged wrongful conduct and asserts that once some harm is apparent, a claim accrues

not only for harm then manifest, but for all harm that may eventuate in the future as a result of the same conduct. Johns-Manville's theory is that Henry Wilson's claim ripened no later than February 1973 when he was diagnosed as having "mild asbestosis." Within three years of that diagnosis, Johns-Manville reasons, Wilson could have instituted a personal injury action seeking damages, not only for asbestosis, but for consequences that might develop later, including separate and distinct illnesses such as mesothelioma [33] or another form of cancer. Had Wilson sued between 1973 and 1976, and then attempted to return to court after the February 1978 malignant mesothelioma diagnosis, he would have been blocked, Johns-Manville asserts, by the well-established rule that a claim or cause of action may not be split. *See generally* Restatement (Second) of Judgments §§ 24–26 (1982). It follows, Johns-Manville concludes, that Wilson's mesothelioma claim is similarly barred when, as occurred here, he simply sat on his right to sue and did not institute any tort action between February 1973 and February 1976. In essence, Johns-Manville argues, Wilson did not have the option to waive tort recovery for asbestosis, and sue for a lethal cancer if and when such a condition developed. We disagree.

Preliminarily, we note that we need not and do not decide whether Johns-Manville's initial premise is correct, *i.e.*, whether judgment on a claim for asbestosis pursued between 1973 and 1976 would have precluded a subsequent claim based on the 1978 mesothelioma diagnosis.[34] It suffices to point out that res judicata (claim preclusion) doctrine and policy would control the decision of that question. But the issue before us is not properly decided under the law govern-

---

**32.** Application of the discovery rule in latent disease cases is widely supported in commentary. *See, e.g.*, Birnbaum, *supra* note 31; Phillips, *An Analysis of Proposed Reform of Products Liability Statutes of Limitations*, 56 N.C.L. Rev. 663, 675–76 (1978); *Developments in the Law—Statutes of Limitations*, 63 Harv.L.Rev. 1177, 1204–05 (1950).

**33.** Johns-Manville concedes that asbestosis and mesothelioma are separate and distinct dis-

eases, and that mesothelioma is not a complication of the former. Brief for Johns-Manville at 11 n.9. Johns-Manville does maintain that both diseases "had the same precise cause," *i.e.*, "[Wilson's] years of exposure to asbestos." *Id.*

**34.** *But cf.* Restatement (Second) of Judgments, *supra*, § 26(1)(b) & comment b (court in first action may expressly reserve plaintiff's right to maintain second action).

ing judgments. Rules of res judicata (claim preclusion) and collateral estoppel (issue preclusion) concern the preclusive effects of *former adjudication.* Here, there has been no former adjudication, no prior action resulting in. a judgment to be given effect in a subsequent action. In shaping its position largely on the basis of decisions concerning limitations on the opportunity *in a second action* to litigate claims that were litigated, or could have been litigated, in a prior action,[35] Johns-Manville has misdirected its attention and argument. This case requires us to focus, not on judgments and their preclusive effects, but on statutes of limita-

tions and the policies they implicate in personal injury actions.[36] We therefore consider below the appropriate delineation of the claim or cause of action in suit in the relevant context.[37]

"Statutes of limitation find their justification in necessity and convenience rather than in logic. They represent expedients, rather than principles." *Chase Securities Corp. v. Donaldson,* 325 U.S. 304, 314, 65 S.Ct. 1137, 1142, 89 L.Ed. 1628 (1945).[38] Two considerations, particularly, motivate legislation placing time limitations on the commencement of litigation.[39] The first,

**35.** Johns-Manville has catalogued an impressive array of court decisions exemplifying the general res judicata rule against splitting an indivisible cause of action. *See* Brief for Johns-Manville at 22–30. However, the cited cases either do not present a statute of limitations issue or do` not involve separate and distinct illnesses. Johns-Manville does cite one decision squarely in its favor, *id.* at 30–33, a recent decision of a lower court in *Baltimore County, Pierce v. Johns-Manville Sales Corp.,* Law No. 124/209/10330 (Balt. Co., Md., Cir. Ct. Sept. 23, 1981), *cert. granted,* No. 7 (Md. Mar. 22, 1982).

**36.** With respect to Johns-Manville's apparent assumption that the dimensions of a claim are inevitably identical for res judicata and statute of limitations purposes, we recall the warning of Walter Wheeler Cook:

The tendency to assume that a word which appears in two or more legal rules, and so in connection with more than one purpose, has and should have precisely the same scope in all of them, runs all through legal discussions. It has all the tenacity of original sin and must constantly be guarded against.

Cook, *Substance and Procedure in the Conflict of Laws,* 42 Yale L.J. 333, 337 (1933). *See also Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.,* 633 F.2d 1212, 1220 (6th Cir. 1980) (disagreeing "with appellant's argument that identical language used in statutes of limitations and insurance policies must necessarily be interpreted identically"), *cert. denied,* —— U.S. ——, 102 S.Ct. 686, 70 L.Ed.2d 650 (1981).

The purposes served by the law of judgments plainly are not precisely the same as those served by statutes of limitations. *See infra* p. 119. Res judicata and collateral estoppel (claim and issue preclusion) rules "relieve parties of the cost and vexation of multiple lawsuits, conserve judicial resources, and, by preventing inconsistent decisions, encourage reliance on adjudication." *Allen v. McCurry,* 449 U.S. 90, 94, 101 S.Ct. 411, 414, 66 L.Ed.2d 308 (1980). *See generally* Restatement

(Second) of Judgments, *supra,* Introduction, at 5–13 ("Finality [of judgments] is the service rendered by the courts through operation of the law of res judicata.").

**37.** As noted earlier, *see supra* note 11, it is incumbent upon us to decide this issue as we believe the District of Columbia Court of Appeals would decide it. Our review of that court's jurisprudence, however, has not cast particular light on the question. Nor do the conflicting decisions of the district court, the summary judgment in this case, *see supra* note 16, and the memorandum opinion in *Fearson v. Johns-Manville Sales Corp.,* 525 F.Supp. 671, 674 & n.4 (D.D.C.1981), substantially advance our inquiry.

**38.** Justice Jackson, writing for the Court, further observed: "[Statutes of limitation] represent a public policy about the privilege to litigate. Their shelter has never been regarded as what now is called a 'fundamental' right or what used to be called a 'natural' right of the individual." *Id.*

**39.** For statements of the policies served by statutes of limitations, see, *e.g., United States v. Kubrick,* 444 U.S. 111, 117, 100 S.Ct. 352, 356, 62 L.Ed.2d 259 (1979); *Chase Securities Corp. v. Donaldson,* 325 U.S. at 314, 65 S.Ct. at 1142; *Order of Railroad Telegraphers v. Railway Express Agency, Inc.,* 321 U.S. 342, 348–49, 64 S.Ct. 582, 586, 88 L.Ed. 788 (1944); Kelley, *The Discovery Rule for Personal Injury Statutes of Limitations: Reflections on the British Experience,* 24 Wayne L.Rev. 1641, 1643–44 (1978); *Developments in the Law, supra* note 32, at 1185–86.

Discouraging prospective plaintiffs from "sleeping on their rights" has occasionally been cited as a third, independent consideration underlying statutes of limitations. *See, e.g.,* Kelley, *supra,* at 1645; Comment, *supra* note 3, at 79. However, our inspection of these authori-

which may be designated *evidentiary*, relates to "the search for truth [which] may be seriously impaired by the loss of evidence, whether by death or disappearance of witnesses, fading memories, disappearance of documents, or otherwise."[40] The second, *repose*, concerns the potential defendant's interests in security against stale claims and in planning for the future without the uncertainty inherent in potential liability.[41]

In the case at hand, these considerations pull in opposite directions. Repose, beyond question, is best served by Johns-Manville's broad definition of the "cause of action" at stake. But in situations involving the risk of manifestation of a latent disease, unlike the mine run of litigation, the evidentiary consideration counsels narrower delineation of the dimensions of a claim. Key issues to be litigated in a latent disease case are the existence of the disease, its proximate cause, and the resultant damage. Evidence relating to these issues tends to develop, rather than disappear, as time passes.

Looking beyond repose and evidentiary considerations, we take into account the interests generally involved in personal injury and death cases: plaintiff's in obtaining at least adequate compensation, defendant's in paying no more than that. Inte-

grating these two, the community seeks to advance, through the system of adjudication, relief that will sufficiently, but not excessively, compensate persons for injuries occasioned by the tortious acts of others. In latent disease cases, this community interest would be significantly undermined by a judge-made rule that upon manifestation of any harm, the injured party must then, if ever, sue for all harms the same exposure may (or may not) occasion some time in the future.

The traditional American rule,[42] adopted in the District of Columbia,[43] is that recovery of damages based on future consequences may be had only if such consequences are "reasonably certain." Recovery of damages for speculative or conjectural future consequences is not permitted. To meet the "reasonably certain" standard, courts have generally required plaintiffs to prove that it is more likely than not (a greater than 50% chance) that the projected consequence will occur. If such proof is made, the alleged future effect may be treated as certain to happen and the injured party may be awarded full compensation for it; if the proof does not establish a greater than 50% chance, the injured party's award must be limited to damages for harm already manifest.[44]

ties indicate that this consideration is itself grounded on the other two purposes motivating statutes of limitations, insuring against loss of evidence and promoting fairness to defendants. *See infra* notes 40–41 and accompanying text.

**40.** *United States v. Kubrick*, 444 U.S. at 117, 100 S.Ct. at 356. Statutes of limitations, therefore, may assist in preventing the assertion of fraudulent claims.

**41.** "Without this freedom the potential defendant may not make the most productive and socially beneficial use of his resources." Kelley, *supra* note 39, at 1644. Early release from liability under short limitations periods, however, may run counter to the position advanced by some commentators, *see, e.g.*, Calabresi, *Product Liability: Curse or Bulwark of Free Enterprise*, 27 Cleve.St.L.Rev. 313, 324 (1978); *Preserving Causes of Action*, *supra* note 31, at 635, that in a free market, the risk of product liability is best placed on the entrepreneur. *See* Comment, *Occupational Carcinogens and Statutes of Limitation: Resolving Relevant Policy Goals*, 10 Envtl.L. 113, 157 (1979).

**42.** *See, e.g., Thompson v. Underwood*, 407 F.2d 994, 997 (6th Cir. 1969) (applying Tennessee law); *Jordan v. Bero*, 210 S.E.2d 618, 629 (W.Va.1974). *See also* Restatement (Second) of Torts § 910, comment a; J. Stein, *Damages and Recovery* § 106 (1972); King, *Causation, Valuation, and Chance in Personal Injury Torts Involving Preexisting Conditions and Future Consequences*, 90 Yale L.J. 1353, 1371–72 (1981); Cooper, *Assessing Possibilities in Damage Awards—The Loss of a Chance or the Chance of a Loss*, 37 Sask.L.Rev. 193, 195 (1973). *But see Feist v. Sears, Roebuck & Co.*, 267 Or. 402, 517 P.2d 675 (1973).

**43.** *Harrington v. Alston*, 267 F.Supp. 505, 506–07 (D.D.C.1967) (applying District of Columbia law); *American Marietta Co. v. Griffin*, 203 A.2d 710, 712 (D.C.1964).

**44.** This "all-or-nothing" approach is the traditional rule. *See, e.g., Healy v. White*, 173 Conn. 438, 443–45, 378 A.2d 540, 544 (1977); *see also* King, *supra* note 42, at 1387; Cooper, *supra* note 42, at 195; Note, *Damages Contin-*

In view of the "reasonably certain" standard, it appears that Johns-Manville is urging for cases of this sort (in which cancer is diagnosed years after asbestosis becomes manifest) more than a time-bar; it is urging, in essence, that there can *never* be a recovery for cancer unless (1) a lawsuit is filed within three years of the asbestosis diagnosis, and (2) cancer becomes manifest during the course of that lawsuit. For it is altogether likely that had Wilson, upon receiving the "mild asbestosis" diagnosis, sought to recover for a cancer which might (or might not) develop, Johns-Manville would have argued forcibly that the probability of such a development was far less than 50%, and was therefore too speculative, conjectural, uncertain to support a damage award.[45]

Concern for judicial economy also influences our decision. Upon diagnosis of an initial illness, such as asbestosis, the injured party may not need or desire judicial relief. Other sources, such as workers' compensation or private insurance, may provide adequate recompense for the initial ailment. If no further disease ensues, the injured party would have no cause to litigate.

However, if such a person is told that another, more serious disease may manifest itself later on, and that a remedy in court will be barred unless an anticipatory action is filed currently, there will be a powerful incentive to go to court, for the consequence of a wait-and-see approach to the commencement of litigation may be too severe to risk. Moreover, a plaintiff's representative in such a case may be motivated to protract and delay once in court so that the full story of his client's condition will be known before the case is set for trial.

Our consideration of this appeal persuades us that a model or rule acceptable for more common personal injury actions may not be appropriate in latent disease cases.[46] With respect to the statute of limitations issue before us, we conclude that a potential defendant's interest in repose is counterbalanced and outweighed by other factors, including evidentiary considerations, securing fair compensation for serious harm, and deterring uneconomical anticipatory lawsuits. We therefore hold that the diagnosis of "mild asbestosis" received by Henry Wilson in February 1973 did not

gent Upon Chance, 18 Rutgers L.Rev. 875, 876 (1964). Recently, there has been some discussion of, and support for, a "simple probability" or "pro rata" approach. Such an approach would allow a percentage recovery equal to the injured party's chance of incurring the future harm. *See, e.g., Jordan v. Bero*, 210 S.E.2d at 640–41 (Neely, J., concurring); J. Stein, *supra* note 42, § 106; King, *supra* note 42, at 1381–87. The "pro rata" approach is followed in England. *See* Cooper, *supra* note 42, at 196–97 (citing, *e.g., Davies v. Taylor*, [1971] W.L.R. 515, 525G, [1971] 3 All E.R. 1259, 1268c (C.A.)). Although the "pro rata" approach may insure that the wrongdoer pays the appropriate amount to the injured class as a whole, it does not eliminate the inequity among individual plaintiffs: plaintiffs who in fact sustain the future harm are undercompensated; those who escape it receive a windfall.

**45.** One study estimates that 15% of asbestosis sufferers later contract pleural mesothelioma and 12% contract peritoneal mesothelioma. *See* Selikoff, Churg & Hammond, *Relation Between Exposure to Asbestos and Mesothelioma*, 272 New Eng.J.Med. 560, 562 (1965).

Even in those instances where the likelihood of the later disease occurring is greater than 50%, the inequity of the reasonable certainty

rule, as interpreted and applied by the courts, is not eliminated. Persons who contract the first, but not the second, disease will receive a windfall and, in the aggregate, the defendant will overcompensate the injured class.

**46.** *Cf. Insurance Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d at 1219 (emphasis in original):

In a nutshell, [Appellants] urge that we treat asbestosis the same as any other disease and that we not make any "special rules" for the cumulative disease situation which asbestosis presents.

We cannot agree. Cumulative disease cases *are* different from the ordinary accident or disease situation.

We recall in this connection Justice Cardozo's counsel to common law judges:

There should be greater readiness to abandon an untenable position when the rule to be discarded may not reasonably be supposed to have determined the conduct of the litigants, and particularly when in its origin it was the product of institutions or conditions which have gained a new significance or development with the progress of the years.

B. Cardozo, *The Nature of the Judicial Process* 151 (1921); *see generally id.* at 116–52.

start the clock on his right to sue for the separate and distinct disease, mesothelioma, attributable to the same asbestos exposure, but not manifest until February 1978. Blannie Wilson's action, we decide, to the extent that it seeks recovery based on mesothelioma, from which her husband suffered and died, was timely filed.

CONCLUSION

For the reasons stated, we hold that Appellant's Survival and Wrongful Death action was timely.[47] We therefore reverse the district court's summary judgment order dismissing the complaint and remand this case for further proceedings.

*It is so ordered.*

---

47. Our determination that Appellant's Survival action is not time-barred renders it unnecessary to reach the question whether a Wrongful Death claim may be maintained despite a time-bar that would have precluded, at the time of the death, a claim for relief by the decedent had he lived. *See supra* note 15 and accompanying text. For the reasons we have stated, Henry Wilson, had he lived, could have instituted an action based on the February 1978 mesothelioma diagnosis within three years of that diagnosis. Therefore, his widow's May 1979 Wrongful Death action, brought within the discrete statutory requirement that such actions be commenced within one year after the death, D.C.Code § 16–2702 (1981), is unquestionably timely.